COURT OF APPEALS
DECISION
DATED AND FILED

February 16, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1432-CR**

Cir. Ct. No. 2017CF549

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JONATHAN C. GAPP,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: LEE S. DREYFUS JR., Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Jonathan C. Gapp was convicted by a jury of first-degree reckless homicide, as a party to the crime, for his role in the delivery of heroin to the deceased victim in this case.  On appeal, he contends the State failed to prove beyond a reasonable doubt that he "'aided and abetted' in the delivery of the heroin that killed" the victim at Gapp's father's house on the morning of Saturday, September 5, 2015, and, thus, that the evidence presented at trial was insufficient to support the jury's finding of guilt.  We disagree and affirm.

¶2     When a defendant challenges the sufficiency of the evidence on a jury conviction,

> he or she bears a heavy burden under our standard of review.  The test for sufficiency of the evidence to convict is highly deferential.  We may not reverse a conviction unless the evidence, viewed most favorably to the State and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we may not overturn a verdict.

*State v. Klingelhoets*, 2012 WI App 55, ¶10, 341 Wis. 2d 432, 814 N.W.2d 885 (citations omitted).

¶3     As relevant to this case, a person is guilty of violating WIS. STAT. § 940.02(2)(a) (2019-20),[1] the specific statute which Gapp was found to have violated, as a party to the crime, if the person "causes the death of another human being … [b]y ... distribution or delivery" of heroin, "if another human being uses the [heroin] … and dies as a result of that use."  Gapp directs us to the "aiding and

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

abetting" jury instruction, which states, as relevant here, that "[a] person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, he knowingly … assists the person who commits the crime." WIS JI—CRIMINAL 402.

¶4 Considering our standard of review, WIS. STAT. § 940.02(2)(a), and this "aiding and abetting" jury instruction, the jury's verdict of guilt in this case must stand if, viewing the evidence in the light most favorable to the State and the conviction, any possibility exists that the jury "could have drawn the appropriate inferences from the evidence adduced at trial," *see **Klingelhoets***, 341 Wis. 2d 432, ¶10, to find that Gapp acted with knowledge or belief that the heroin dealer in this case, "T", was distributing or delivering, or intending to distribute or deliver, heroin to the victim, Gapp knowingly assisted T, and the victim died as a result of using the heroin. We conclude that sufficient evidence was presented at trial from which a reasonable jury could find this.

### *The Trial Evidence*

¶5 The victim's mother testified at trial that Gapp and the victim had dated for approximately seven years up until the time of the victim's death. The victim had been staying with Gapp at his father's house most of the time in the months leading up to her death, but in the days just before her death, she had been staying at her parents' house. Both Gapp and the victim were heroin addicts.

¶6 At the victim's request, her mother gave her some money on the night of Friday, September 4, 2015, heading into Labor Day weekend, "probably" forty dollars. Gapp was supposed to pick up the victim around 8:00 p.m. that night, but ended up picking her up sometime around or after 10:00 p.m. According to her

father, who also testified, while the victim was waiting for Gapp to pick her up that night, she was "pacing back and forth, back and forth, back and forth."

¶7 Also testifying was Dennis Kolbeck. Around the time leading up to the victim's death, Kolbeck utilized Gapp and/or the victim to procure heroin for himself from T. Kolbeck was a regular heroin user around that time—spending "60 to 120 [dollars] a day" for heroin—and as a regular user, he would use "[t]hree, four times a day, maybe more." This level of use was needed "[t]o keep you from going through withdrawals," which includes "[b]ody aches, sweats, muscle cramps, vomiting, [and] diarrhea." Kolbeck testified that a daily user of heroin would get sick "probably within 12 hours" if he/she did not procure more heroin.

¶8 Kolbeck explained that because Gapp helped him out by procuring heroin for him through T, he would give Gapp some of the heroin he purchased— essentially "pay[ing]" Gapp "a cut" as a "finder's fee"—because "it was through [Gapp's] person so you would end up helping him out since he helped you out." This was part of the drug user's "code." Before leaving on a camping trip for Labor Day weekend, 2015, Kolbeck contacted Gapp so Gapp could procure heroin from T for him before he left for the trip, but the effort was unsuccessful.

¶9 Sheriff's detective Jay Dunston testified that he was dispatched to Gapp's father's house around 9:00 a.m. on September 5, 2015, because of a 911 call Gapp made related to the victim's condition. Dunston spoke with Gapp at the house. When asked what led up to the 911 call, Gapp told Dunston that he and the victim "had gone to bed at about 10:30 p.m.," and he woke up around 3:30 a.m. and engaged with his brother. Gapp indicated that the victim "was not displaying any medical symptoms at that time," but when he woke up next to her later that morning, she was "laying facedown," was "blue," and "wasn't breathing." When Dunston

4

asked Gapp if he and/or the victim had used any heroin, Gapp "indicated that he had no knowledge of that." Gapp "admitted that they were both intravenous heroin users, however [they] had not used recently," specifically adding that "he had no knowledge of [the victim] using heroin in the last 24 hours."

¶10 In a handwritten statement Gapp provided at the scene, he acknowledged that the victim was a heroin user who would "shoot heroin with a needle," but indicated that to his knowledge, the last time she used heroin was "[a] week or two" earlier. When asked where the victim would get her heroin from, Gapp responded, "I do not know." When asked if he himself used heroin, Gapp responded, "I used to." When Dunston tried to take Gapp's phone from him, Gapp was "hesitant in giving it" to Dunston, but Dunston "took it anyways."

¶11 Sheriff's detective Nathan Plennes testified that he interviewed Gapp at the sheriff's department later in the day on September 5. Gapp first told Plennes that he picked up the victim the evening of September 4, brought her back to his father's house, and they went to sleep. After some probing by the detective, Gapp revealed that after picking up the victim, she asked to "meet up with a guy named 'T' to give him some money that she owed him." Gapp said he then drove her to meet T at a park and ride, the victim got out of the car and met with T, and then Gapp and the victim drove back to Gapp's father's house. Gapp stated that he did not know what the victim owed T money for. Gapp stated that he and the victim watched movies, he fell asleep, and he woke up around 3:30 a.m. and engaged with his brother and that the victim seemed fine at that time. Gapp then fell back asleep and later woke up and found her deceased.

¶12 Gapp told Plennes that while he had seen T and had "picked [the victim] up from T['s]," he "doesn't interact with [T]," is "not aware of who T [is],"

and did not have any contact information for T. When asked when the last time was that he had used any drugs, Gapp told Plennes that it had been approximately three weeks.

¶13   Plennes testified regarding various drug-related items found in Gapp's bedroom the morning of the victim's death, including bloody tissues next to Gapp's bed. Plennes explained that tissues are commonly used to stop bleeding after a person injects something into his/her veins. He described a syringe with dried blood on it that was found on the headboard shelf of the bed, another syringe on top of the bed, and alcohol pads/wipes. He described a Naloxone kit, which is "commonly used ... if someone's overdosing you would inject them with Naloxone to overcome the opiate overdose," as well as more syringes and a "tin cooker ... a small metal like a cup that they use to cook up heroin," found in a dresser in the bedroom. Also found in the dresser was a box containing alcohol wipes, cotton balls, a spoon, cookers, a glass pipe, a razor blade, cellophane wrappers, an empty vial of Naloxone, as well as "a large container of used needles." Plennes stated that this was all drug paraphernalia, specifically for use with heroin, and he explained the significance of each item. He also testified to observing on Gapp's arm a "track mark or injection site where someone injects narcotics" and that Gapp "admitted he shoots up in that arm." The mark was a "fresher mark," and it appeared as if Gapp had used it to inject something into himself "within the last week or so."

¶14   Sheriff's detective Aaron Hoppe also testified. He indicated that he is "very familiar with the habits and routines" of heroin users, and he confirmed that heroin addicts tend to "use their drugs right away," although sometimes they "try" to save some, and that they "ha[ve] to use multiple times in one day" or "[t]hey get physically sick and the symptoms are too much." Hoppe confirmed that both Gapp and the victim were heroin addicts and as such would have needed to use heroin

"[m]ultiple times" every day. He testified to a cereal box that was found in Gapp's bedroom with "over 60" used syringes in it.

¶15 Hoppe also testified that the syringe found on the headboard shelf of Gapp's bed, the one with dried blood on it, had been sent to the state crime lab. According to the results of the testing, the victim's DNA was on "the syringe body, the plunger, and the grip," and Gapp's DNA was on the syringe cap.

¶16 The evidence presented through Hoppe also indicated that on September 3, 2015, the victim herself directly procured heroin from T because Gapp was experiencing significant sickness from withdrawal. The evidence further suggested that because of this procurement, the victim owed T money and was planning to pay him back on September 4, 2015. Additional evidence indicated, however, that the victim also was in search of heroin and hoping to procure some for her own use the evening of September 4, 2015. Gapp contacted T and arranged the meeting.

¶17 Hoppe testified that when Gapp was interviewed by another detective, "Gapp would not agree to a download" of information from his cell phone. Police were eventually successful in downloading the information, however, which showed that Gapp had two phone numbers for T stored as a contact and that Gapp previously had contacted T seventy-eight times, with the last time being on September 4, 2015, at 11:28 p.m.

¶18 The phone history further suggested that on August 28, 2015, Gapp arranged a drug purchase for Kolbeck. Text messages showed that the victim assumed Gapp would have "got to keep a pretty decent amount for [himself]" from this transaction, and the victim was frustrated that Gapp had not "given [her] a little chunk." In a text to Gapp, she further mentioned that Gapp "sound[ed] super faded"

when she called him "so obviously you had already done shit before you split the 'rest' of the stuff that we again, 'we got,' out of [Kolbeck's] shit." The victim mentioned how "all of the other times we've taken [Kolbeck] through 'T' we've gotten a super decent amount." Gapp responded to the victim that he "went through Ice because 'T' wasn't around." In analyzing this exchange, Hoppe agreed that the victim was complaining to Gapp that "she didn't get a fair share."

¶19 In texts from the next day, August 29, 2015, the victim told Gapp how the heroin she used earlier in the day had "already worn off," and she stated she was "feeling poopy." Gapp responded that he "wishe[d] [he] still had some but the little bit [he] had [he] did at nine a.m." Later that night, the victim texted Gapp asking, "[T]hink we'd be able to figure anything out for tonight like you should talk to 'T' and see if he's good and if he would do a dub or a dime or something for us." At 8:01 p.m. the victim called Gapp, and at 8:35 p.m., she texted him, saying, "[W]ell?"

¶20 The next morning, August 30, T texted Gapp, stating, "I'm back." Later that morning, the victim asked Gapp about meeting somewhere, and Gapp responded, "[T]hat would be cool. Does it look like you'll have any luck for $ because I don't know what we could do." She replied, "I'm not sure just yet. Have you talked to 'T' at all." Gapp replied that T had contacted him that morning saying he was back. The victim texted Gapp shortly thereafter saying, "I got 40." Gapp replied, "[S]o should I ask him if he can help us for that?" Minutes later, Gapp made a call to T.

¶21 The next day, August 31, around 9:00 a.m., Gapp texted the victim "fuck my stomach hurts. Today is going to suck ass, have a good day baby girl." She replied, "I'm sorry babe didn't you save anything." Gapp responded, "[Y]eah it didn't do much but I'm glad I did." The victim replied, "[T]hat's good. Yeah I

ended up doing a small amount last night a little this morning and I still have a little left for later because I figured it['s] going to be a long day that I'm probably going to want more later tonight." That afternoon, the victim texted Gapp, "If you think there's any way you could try to come up with a couple bucks for us to get something tonight that would be seriously awesome because I guess … I'm going to be sick tomorrow." Gapp responded, "I know I just started getting sick now. I feel horrible."

¶22 Later that afternoon, Kolbeck texted Gapp asking, "[C]an we go to 'T.'" Gapp replied, "[Y]ep," and Kolbeck indicated that he had $100. Gapp told Kolbeck, "[F]uck, we're going to have to try and find 20 more." Four minutes later, Kolbeck replies, "I got 120." Gapp told Kolbeck, "I'm gonna call 'T' quick, wash my hands and head over." Kolbeck replied, "[O]kay." Gapp texted back "you're coming with me this time right?" Kolbeck replied, "[Y]eah" and later "hey I guess [the victim] is coming to get me. I'll give her some for you or if you want to you can come by me when I get back and I can give you a little." Later, Gapp called T and subsequently texted him saying, "[W]here did you say you are? We'll be in Waukesha in like ten minutes." Then T called Gapp. A short while later, Gapp called T. About twenty minutes later, Gapp texted T, "[P]lease don't tell that retard any prices because I charge him 120." Six minutes later, T replied, "[T]his is a business, at the end of the day I didn't tell him anything. He said he thinks you're cutting him." Gapp later replied to T with "[Kolbeck] took that tonight and he said those are amazing. I cannot wait to take mine this weekend. Thanks for everything 'T'." A few hours later, the victim and Gapp text back and forth, discussing their use of heroin at T's and then more later "at the park and ride," and the victim indicated she thought Gapp took more of the heroin than his fair share.

¶23     In the afternoon of September 1, 2015, Gapp texted the victim, "Oh my God today sucks and I didn't even have a whole shot for today." The victim responded, "[T]hink you'll possibly be able to figure something out for tonight?" The victim later texted Gapp indicating that "[Kolbeck] is asking me for 'T''s number so he can get more doses for his camping trip."

¶24     On September 3, 2015, the victim texted Gapp concerned that she could not find her wallet containing her heroin. She added,

> [I]t's not like I could really do more anyways because I would legit like have absolutely nothing left to even do. Like I'll be lucky for what I even have left it would be enough to take my sick off tomorrow. I know you seem to think that if I fry and collect the smeared stuff that I can get way more, but I highly doubt it.

Gapp responded, "I'm sorry babe I don't have a shot left either. I'm gonna try to figure something out for us tonight if possible." Six minutes later, Gapp texted T and asks if he (Gapp) could "stop by … tonight." T texted back, "[Y]eah I'm here." The victim informed Gapp that she found her wallet. Gapp indicated that he would be able to see T around 9:00 p.m. At 8:22 p.m., the victim texted Gapp saying she

> attempted to do some of what I had left which was legit absolutely nothing.… I added some water to it and tried to get most of it off the bag which I got some and it got pretty dark but there's still some left so I guess I'll try to get the rest of it tomorrow…. I really hope it will do something but I have a feeling it won't because I was literally left with like less than a nickel size chunk in addition to the other smeared stuff.

At 8:53 p.m., Gapp called T, and a minute later texted him with "please call me back ASAP. I'm on my way." Then more calls were exchanged between Gapp and T. About twenty-five minutes after the last of those calls, Gapp and the victim exchanged texts and calls. A half hour later, the victim texted Gapp to tell him that

10

in the future, he cannot meet her at her house; instead, if Gapp "ha[s] something for" her, he will need to "drop it off" because she was getting "screamed at" by her father after she had gone outside of the house to meet Gapp.

¶25    On September 4, 2015, Gapp and the victim exchanged texts regarding meeting up with T to "pay [him] back." At one point, the victim texted Gapp saying, "I know I'll have his money for sure. I just don't know about any extra." At 10:40 p.m. Gapp called T. At 10:58 p.m., Gapp texted the victim saying, "I'm on my way I'll be there in about 15." At 10:59 p.m., Gapp texted her, stating, "'T' said we can stop by." Then Gapp and T exchanged calls, and Gapp and the victim exchanged texts. There was a final exchange of calls from T to Gapp and then Gapp to T, with that last call at 11:28 p.m.

¶26    Hoppe testified that from his investigation of their cell phones, he determined that Gapp and the victim were together at the park and ride at about 11:30 p.m. He further testified that his investigation of their phones gave no indication as to any other possible sources from whom Gapp and the victim could have gotten drugs that night other than T.

¶27    Hoppe was asked to consider the testimony of the victim's father regarding the victim "pacing and [being] very anxious" while waiting to be picked up by Gapp from her parents' home the night of September 4, 2015. Hoppe confirmed that he has seen behavior like that from heroin addicts and that they act like that "[w]hen they need or they're trying to get a fix or if they're trying to pick up or they're about to they get very antsy."

¶28    Hoppe testified regarding a video on Gapp's phone that was taken around 6:30 a.m. on September 5, 2015, which shows the victim "cooking the heroin and later injecting it into her hand, and you can hear Mr. Gapp and [the victim]

11

communicating during this time." The video was played for the jury. Using a still image from the video, Hoppe described the various visible drug paraphernalia in the image.

¶29    When challenged on cross-examination as to "[w]hat's in the text messages that said they got drugs that evening," Hoppe responded,

> She doesn't have heroin. They're both looking for heroin on the evening of the 4th …. Again, you're meeting up with a known drug dealer. It's pretty obvious what the intentions were, and they don't have any heroin, they don't come in contact with anyone else throughout the remainder of the evening, and several hours later she's injecting heroin.

¶30    A county medical examiner also testified. She stated that she had performed probably over 100 autopsies on persons who had overdosed on heroin and that she also performed the autopsy on the victim in this case. The examiner observed "some bruises on [the victim's] skin [as well as] multiple needle puncture marks which is indicative of … injection drug use." The puncture marks were "in the antecubital region," "on the back of the hands," and "also one on the top of her foot." Based upon the weight of the victim's fluid-filled lungs, as well as testing performed upon samples of the victim's blood, urine, and "soft tissue and the vein from the injection site," the examiner opined that the victim died as a result of using heroin within approximately eight hours of her death.

*Analysis*

¶31    The evidence suggested that in the days leading up to the victim's death, Gapp was connecting with T on a nearly daily basis to procure heroin from him. There is no evidence suggesting they were long-time friends or on the same softball team together—the jury would have unmistakably understood that T was a

heroin dealer and Gapp's connection with him was to get heroin for himself and others.

¶32     The evidence showed that the victim, with Gapp present, shot up with heroin around 6:30 a.m. on September 5, 2015, and when Gapp woke up a few hours later, the victim was deceased. The testimony was that heroin addicts, like Gapp and the victim, tend "to use their drugs right away," need to ingest heroin several times a day in order to ward off significant and painful withdrawal, and are looking for ways to procure heroin to use on a daily basis.

¶33     The night of September 3, 2015, the victim was almost completely out of heroin and trying to scrape together remnants. Gapp told her he was "gonna try to figure something out for" them for that night. He told her he would be able to see T around 9:00 p.m. At 8:53 p.m., Gapp called T, and then texted T, "I'm on my way." More calls were exchanged between Gapp and T, and calls were then later exchanged between Gapp and the victim. The victim's subsequent text to Gapp suggests that Gapp met the victim for a short time outside of her house after that, with the victim stating that in the future, if Gapp "ha[s] something for" her, he will need to "drop it off." The evidence suggests Gapp met with T the night of September 3 to procure heroin and then met with the victim outside of her home to give her some.

¶34     On September 4, 2015, the victim was anxiously pacing at home while waiting to get picked up by Gapp. Hoppe confirmed that he had seen behavior like that from heroin addicts—that they act like that "[w]hen they need or they're trying to get a fix or if they're trying to pick up or they're about to they get very antsy." Gapp and the victim exchanged texts regarding meeting up with T. She stated she would have "[T's] money for sure," and she was clearly hoping, but unsure if, she

would have "extra." The evidence indicated that Gapp picked up the victim and drove her to the park and ride where she met with T. Hoppe told the jury that his investigation gave no indication as to any other possible sources from whom Gapp and the victim could have procured heroin that night other than T. Hours after meeting with T, the victim was videotaped injecting herself, with Gapp present. Thereafter, she died of a heroin overdose.

¶35 A jury could reasonably infer that whenever Gapp arranged a meeting with T, it was to procure heroin from him; that Gapp drove the victim to meet with T the night of September 4 not only so she could pay T back but also to procure additional heroin for her use; and that the victim procured heroin from T during that meeting. A jury could also reasonably infer that Gapp knew the victim had procured heroin from T and that this was the same heroin she injected into herself in the early morning of September 5, 2015, with Gapp present. Additionally, Gapp's record of lying to the detectives and trying to prevent them from accessing his phone certainly would have indicated to the jury that he was conscious of his guilt and attempting to hide significant evidence, which included not only his extensive heroin-procuring relationship with T, who Gapp claimed to have barely known, but also his specific involvement in procuring heroin for the victim.

## *Conclusion*

¶36 Viewing the evidence in the light most favorable to the State and the conviction, as we must, there is more than a possibility that the jury "could have drawn the appropriate inferences from the evidence adduced at trial" to find that on September 4, Gapp acted with knowledge or belief that T was distributing or delivering heroin to the victim at the park and ride, Gapp knowingly assisted T by

14

arranging the meeting and driving the victim to him, and the victim died from using that heroin.

> *By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.